28304. CITY OF ATLANTA *v.* RICH.

DECIDED NOVEMBER 30, 1940. REHEARING DENIED DECEMBER 20, 1940.

*J. C. Savage, J. C. Murphy, E. L. Sterne, F. A. Hooper Jr.*, for plaintiff in error.

*Hirsch, Smith & Kilpatrick, Julian E. Gortatowsky*, contra.

MacINTYRE, J. This is an action for damages in the civil court

of Fulton County growing out of the breaking of a tombstone in Oakland Cemetery. The judge, sitting without a jury, under an agreed statement of facts, ordered a recovery by the plaintiff of $65 and costs. The defendant's motion for new trial was over-ruled and it excepted. The appellate division of said court affirmed the judgment and the defendant excepted.

The agreed statement of facts was in effect as follows: The City of Atlanta obtained title to Oakland Cemetery, which consists of a tract of land lying within the territorial limits of the city, by fee-simple conveyances made between the years 1857 and 1894 by various individuals. The cost was approximately $8500. This property was acquired by the city for the purpose of building and maintaining a cemetery. The city laid out roads on the property, and subdivided it into lots and blocks for burial purposes. There are now approximately 2400 lots in Oakland Cemetery, and all of them have been sold by the city to individuals for considerations ranging from $10 to $30 per lot. The proceeds from said sales have gone into the treasury of the city. The city employs ten men, including a superintendent, whose duties are to take care of the roads and grounds in the cemetery, to protect the graves and monuments, to attend to the digging of graves therein, to aid in the opening and closing of graves, to move grave-markers and tombstones, and to do all other necessary and proper acts for the performance of the above duties. An ordinance was passed on January 21, 1938, fixing a schedule of charges for specified services rendered by the city employees at the cemetery. During the year 1938 the city collected from these charges $1557.50, and the cost of labor, materials, etc., used during that year to operate and maintain the cemetery was $15,000. The cemetery is not operated for profit, but is maintained at a loss.

Mrs. Maude Rich purchased a lot in said cemetery and placed a white marble slab on the grave of a near relative at a cost of $65. Mrs. Rich's lot is adjacent to the lot owned by the Springers. On this Springer lot there was a monument consisting of two distinct pieces of marble, to wit: a base stone or slab weighing 1400 pounds, and a headstone three feet six inches high, weighing 3200 pounds, and resting on said base stone. The Springer monument was directly in line with the marble slab on the plaintiff's lot, and there was a distance of five inches between the nearest ends of

the Springer monument and the slab on the plaintiff's lot. In preparing for a burial on the Springer lot during April, 1939, it was necessary to move the Springer monument above described. The superintendent of Oakland Cemetery, Mr. Everett, instructed four city employees to move the monument, and in moving it the headstone tumbled from the base and fell on the marble slab on the plaintiff's lot, crushing and cracking it into twelve different pieces and demolishing it for the purpose for which it was intended. Mrs. Rich replaced the demolished marble stone with one of identical size and quality, purchased from the marble company from which she had procured the first stone, at a cost of $65. This amount was the damage Mrs. Rich sustained. The city charged and received from the Springers $10 for services rendered attending the Springer burial. The cost to the city in labor was $16. There are in the City of Atlanta and in its immediate environs nine cemeteries other than Oakland Cemetery, and they are privately owned and operated for a profit.

The sole question involved is whether the defendant, at the time its employees were moving the monument, which was necessary in preparing for a burial and which resulted in the damage to the plaintiff's tombstone, was engaged in the performance of a governmental or a ministerial function. The Code, § 69-301, states the rules determining the liability of municipalities for tortious acts as follows: "Municipal corporations shall not be liable for failure to perform, or for errors in performing, their legislative or judicial powers. For neglect to perform, or for improper or unskillful performance of their ministerial duties, they shall be liable." Accordingly, it was held in the case of *Cornelisen* v. *Atlanta,* 146 *Ga.* 416 (91 S. E. 415): "Where a city maintains a park primarily for the use of the public, intended as a place of resort for pleasure and promotion of health of the public at large, its operation is in virtue of the governmental powers of the municipality, and no municipal liability would attach to the non-performance or improper performance of the duties of the officers, agents, or servants of the city in respect to keeping the park safe for use by members of the general public. It would not affect the public character of the duties of the officers, agents, or servants of the city that a purely incidental profit might result to the city from its operation or management of the park. . . But if the city, having charter

authority, maintain the park primarily as a source of revenue, the duty of maintaining it in a safe condition for the use for which it is intended would be ministerial, and municipal liability would attach for breach of such duty."

The cases cited by the defendant dealing with parks, public auditoriums, prisons, and hospitals for the poor, which are maintained by the city for the use of the public and intended as a place of resort for pleasure and the promotion of health and the public at large, come under a different category or rule from waterworks maintained by the city, where all the citizens pay for water, and the main or major part of the business is to supply water to individual citizens for which each pays, although fire plugs and water therein are furnished by the city without cost for the use of the public generally. Under like conditions, the same rule applies to light plants which furnish free street lights to the city. "If a municipality owns or controls a cemetery, it has been held that the municipality is liable for the acts of its officers which it has ratified, in an exercise of its statutory powers, in an unlawful manner in connection with such cemetery. And where a municipality owns a cemetery within its limits, under lawful authority, especially where it sells lots therein for burial purposes, it must exercise the same degree of care in preventing damage to others as would be required of natural persons, and it is liable for its negligence in connection therewith." 6 McQuillin's Mun. Cor., supra.

With reference to the public auditoriums above referred to, which have both free and pay entertainments, generally speaking they are primarily for every member of the public, that is the public as a whole, and not exclusively for pay members of the public. The sphere of operation of such auditoriums, parks, and hospitals for the poor includes primarily the general public, and thus the lesser function (pay entertainments) becomes merged with and into the greater function (free entertainments or other operations for the benefit of the public at large), and they together become an entity which is primarily used by the general public. But where, as here, none but the members, that is, those who pay for easements in the cemetery, are permitted to use it as such (that is, where it is primarily for pay members of the public, to wit, those who buy lots therein), the sphere of its operation is so contracted as to exclude the general public (or the public at large) from the

use of it for cemetery purposes; and thus, even if we concede that a few paupers are buried there without paying therefor, the function of operating the cemetery primarily for the public at large becomes the lesser function (or use) which is merged into the greater function of operating it for its pay members, and the sum total of its operation assumes the manner and form of an entity the operation of which is primarily only for those individuals who buy lots. We do not think it should be said that it is maintained primarily for the use of the public as a whole. Under the agreed statement of facts it seems to us that the primary object of the conducting of the cemetery was the sale of lots (and the subsequent charge of the upkeep thereof), and that the conduct of the servants of the city was not in respect to the duties devolved upon them by virtue of the sovereign or governmental function of the city, but were in the performance of a ministerial duty.

It might be noted that in operating a cemetery there would have been no negligence upon the part of the city, or no violation of its duty to erect monuments or beautify the lots, unless and until it arose by contract from hire so to do. The poor of Atlanta benefit from the operation of the Grady Hospital, and *all citizens of Atlanta* may directly receive the manifold benefits of Piedmont Park and the city auditorium as they desire so to do, whereas here no one could take advantage of this cemetery unless he paid for the privilege of so doing by buying a lot and perhaps, in all likelihood, paid for its upkeep.

We think the judge, sitting without a jury, was authorized to find, under the agreed statement of facts, that at the time of the damage to the plaintiff's tombstone, the City of Atlanta was engaged in the performance of a ministerial function and not a governmental function.

*Judgment affirmed. Broyles, C. J., and Gardner, J., concur.*